```
1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3      *  *  *  *  *  *  *  *  *  *  *  *  *
      UNITED STATES OF AMERICA    *
4                                 *    CRIMINAL ACTION
                     v.           *    No. 22-10328-RGS-1
5                                 *
      AHSAN ARTY                  *
6                                 *
      *  *  *  *  *  *  *  *  *  *  *  *  *
7

8

9            BEFORE THE HONORABLE RICHARD G. STEARNS
                  UNITED STATES DISTRICT JUDGE
10                        PLEA HEARING
                         May 25, 2023
11

12     APPEARANCES:

13          UNITED STATES ATTORNEY'S OFFICE, (By AUSA Philip A.
       Mallard) 1 Courthouse Way, Suite 9200,  Boston,
14     Massachusetts, 02210, on behalf of the United States of
       America
15
            ZALKIND DUNCAN & BERNSTEIN, LLP, (By Rachel Stroup,
16     Esq.) 65A Atlantic Avenue, Boston, Massachusetts
       02110, on behalf of the Defendant
17

18

19

20

21                                   Courtroom No. 21
                                     1 Courthouse Way
22                                   Boston, Massachusetts 02210

23
                      James P. Gibbons, RPR, RMR
24                        Official Court Reporter
                      1 Courthouse Way, Suite 7205
25                    Boston, Massachusetts  02210
                       jamesgibbonsrpr@gmail.com
```

```
1                    P R O C E E D I N G S

2            THE CLERK:  All rise.

3        (Whereupon, the Court entered the courtroom.)

4            THE CLERK:  Court is open.  You may be seated.

5        This is Criminal Matter No. 22-10328, United States of

6    America versus Ahsan Arty.  Would counsel please identify

7    themselves for the record.

8            MR. MALLARD:  Good morning, your Honor.  Philip

9    Mallard for the United States.

10           MS. STROUP:  Good morning, your Honor.  Rachel

11   Stroup for Mr. Arty.

12           THE COURT:  Thank you.  Good morning.

13       All right, Ms. Stroup, as I understand it from what I

14   see in the file is that your client is offering to waive

15   indictment, plead guilty to a two-count superseding

16   information pursuant to a plea offered under Subsection (C)

17   of Rule 11, meaning a binding recommendation submitted to

18   the Court for its approval or potential rejection, although

19   that's really pretty rare.

20       Is that --

21           MS. STROUP:  That's correct, your Honor.

22           THE COURT:  -- a reasonable summation?

23           MS. STROUP:  Yes.

24           THE COURT:  All right.  Let's proceed then.

25       Tim.  Would you swear in the defendant.
```

```
 1              THE CLERK:  Please stand.

 2         Please raise your right hand.

 3                      ASHAN ARTY, sworn.

 4         THE CLERK:  Thank you.  You may be seated.

 5         THE COURT:  Is "Arty" the correct pronunciation?

 6         THE DEFENDANT:  Yes.

 7         THE COURT:  Mr. Arty, my name is Richard Stearns,

 8    by way of counterintroduction.  I'm a judge of the United

 9    States District Court.

10       I'm going to ask you some questions, and the reason for

11    the questions is that I am required to make an independent

12    determination that your decision to waive indictment and

13    your decision to plead guilty are decisions made voluntarily

14    and with full knowledge of the consequences of doing so.

15        So if at any point anything I say or any question I ask

16    is confusing, either ask me to rephrase it, or feel free to

17    speak privately with Ms. Stroup before you answer, okay?

18              THE DEFENDANT:  Yes, your Honor.

19              THE COURT:  For the record can you tell us your

20    full name.

21              THE DEFENDANT:  Ahsan Arty.

22              THE COURT:  And how old are you, Mr. Arty?

23              THE DEFENDANT:  Twenty-four.

24              THE COURT:  Where were you born?

25              THE DEFENDANT:  Fort Campbell, Kentucky.
```

```
 1              THE COURT:  Fort Campbell, Kentucky?

 2          So you're now 24.  Well, I assume your dad was in the

 3     Army, or your mom?

 4              THE DEFENDANT:  Yeah, my father.

 5              THE COURT:  Did you grow up on the base or --

 6              THE DEFENDANT:  No.  We moved to Massachusetts

 7     early.

 8              THE COURT:  Where did you move to in Massachusetts?

 9              THE DEFENDANT:  Cambridge.

10              THE COURT:  Cambridge?

11              THE DEFENDANT:  Yes.

12              THE COURT:  Did you attend the Cambridge schools?

13              THE DEFENDANT:  Yes.

14              THE COURT:  How far did you go in school?

15              THE DEFENDANT:  Twelfth grade.

16              THE COURT:  Twelfth grade.

17          Did you get your diploma?

18              THE DEFENDANT:  No, I have my GED.

19              THE COURT:  GED?

20          Which school were you at?

21              THE DEFENDANT:  Rindge, Cambridge Rindge & Latin.

22     That was the high school.

23          I went to middle school there.

24          I went to school all my life in Cambridge.

25              THE COURT:  Rindge & Latin is a good school, as
```

1    best I know.

2        Did you play sports or --

3            THE DEFENDANT:  Basketball.

4            THE COURT:  Any other hobbies, interests?

5            THE DEFENDANT:  I liked sneakers when I was growing

6    up.

7            THE COURT:  All of us do.

8        You're not married, are you?

9            THE DEFENDANT:  Married?

10            THE COURT:  Yes.

11            THE DEFENDANT:  No.

12            THE COURT:  No children?

13            THE DEFENDANT:  No.

14            THE COURT:  Do you have brothers and sisters?

15            THE DEFENDANT:  Yes.

16            THE COURT:  They're also in Cambridge, your

17    brothers and sisters?

18            THE DEFENDANT:  They're older, but they're still

19    around.

20        I don't think -- they don't live in Cambridge, though,

21    no.  We all grew up in Cambridge.

22            THE COURT:  Are your parents still in Cambridge?

23            THE DEFENDANT:  My father is.

24            THE COURT:  Your father is?

25            THE DEFENDANT:  Actually both my parents are right

1    now.

2             THE COURT:  And he's obviously retired from the

3    military?

4             THE DEFENDANT:  Yes.

5             THE COURT:  What kind of jobs have you done?

6             THE DEFENDANT:  Me?

7             THE COURT:  Yes, jobs since you left school or

8    during school.

9             THE DEFENDANT:  Jobs?

10            THE COURT:  Jobs.  What --

11            THE DEFENDANT:  I've had a numerous amount of jobs

12   in my life.

13            THE COURT:  Well, if you said you had a vocational

14   skill, what would it be?  How would you identify yourself?

15            THE DEFENDANT:  I don't know.  I don't know.

16            THE COURT:  You can just say, "I'm a hard worker."

17            THE DEFENDANT:  I'm a hard worker.

18        (Laughter.)

19            THE COURT:  This question is not meant to be

20   intrusive.  I'm required by law to ask it.

21        Have you ever been treated for any mental or

22   psychological issue?

23            THE DEFENDANT:  No, I don't believe so.

24            THE COURT:  Are you taking presently any

25   prescription medication that would in any way interfere with

1      your ability to understand this proceeding?

2              THE DEFENDANT:  No.

3              THE COURT:  Some of these questions I ask you're

4      going to think are obvious, "He must know what the answer

5      is," but I have to ask them.

6          For instance, I'm going to ask you if Ms. Stroup has

7      explained to you what it means to "waive an indictment"?

8      And I know the answer is "yes," but I have to ask it anyway.

9              THE DEFENDANT:  Yes.

10             THE COURT:  An "indictment" is a charging document,

11     which ordinarily is active, in the sense viable, after it

12     has been ratified by an agency, or actually a court agency,

13     called the "grand jury."

14         The grand jury is a larger version of the small jury,

15     or what we call the "petit jury" -- we still use the French

16     Norman phrases -- that sits and makes judgments here in open

17     court.

18         The grand jury is "grand" because it's 23 members,

19     rather than 12.  It need only proceed by majority vote of

20     its 23.  It meets in secret.  Typically it hears only the

21     government's side of the case, and the standard of proof

22     that a grand jury has to observe is fairly low, somewhat

23     close to probable cause; and, "Is it more likely than not

24     that the person the government is accusing in fact committed

25     the crime that the government specified"?

1        The importance of the indictment is that it gives a

2    prosecutor authority to proceed in the prosecution of what

3    we call a "felony" crime.

4        A "felony" crime is any crime with a potential

5    punishment of more than a year, which is what makes it a

6    serious crime.

7        When a person waives the indictment, that is, gives up

8    the right to insist that a grand jury hear the case first,

9    the government is permitted to proceed just as if it had the

10   permission to do so from a grand jury, and then it proceeds,

11   as the prosecutor has here, by way of a document described

12   as an "information."

13       "Information" is a word we'd usually use to describe a

14   charging document that specifies a lesser crime, a

15   misdemeanor, but again because of the waiver, the prosecutor

16   can now proceed with a felony charge.

17       Now, because of the secrecy and the low standard of

18   proof, I think there are any number of lawyers who would say

19   that the grand jury just has not proved to be the protector

20   of individual rights that perhaps the framers of the

21   Constitution thought.

22       Their experience with the grand jury in England was far

23   different, I think, than the recent experience in the U.S.

24   The grand jury I think as they remembered it in England was

25   a fairly vibrant institution, and quite commonly it defied

1    the Crown; that is, the Crown being the prosecuting agency

2    at the time.

3        However, having said that and understanding why most

4    lawyers have that opinion, I was many years ago a

5    prosecutor, and I worked with any number of grand juries.  I

6    have to say it is not unheard of for a grand jury to refuse

7    permission to a prosecutor to proceed, although it is more

8    likely, and this certainly happened to me on a number of

9    occasions, that the grand jurors persuade a prosecutor that

10   perhaps the case isn't quite as serious as the prosecutor

11   thought it was and perhaps some lesser or more diminished

12   charge is appropriate.

13       So I would never say it is no protection at all,

14   although I do understand the arguments that lawyers make

15   about it not being what was perhaps intended of the origins.

16       But understanding all of that, I see you've signed a

17   written waiver that you're willing to proceed by way of a

18   waiver of the indictment; is that fair enough?

19            THE DEFENDANT:  Yes.

20            THE COURT:  All right.  I find the defendant is

21   waiving indictment voluntarily, that he understands the

22   consequences of doing so; and I see no reason not to accept

23   the waiver, and I will so indicate by signing it as a

24   witness on the line provided with today's date, which is, as

25   I recall, May 25, 2023.

1              All right, Tim, you can file the waiver.

2              (Pause in proceedings.)

3              THE COURT:  Mr. Arty, another obvious question is,

4    has Ms. Stroup explained the indictment to you?  I'm calling

5    it an "indictment" now even though it's labeled

6    "information" because of the waiver.

7         Has she explained the two charges that it sets out,

8    and, more particularly, and I'll define the term, the

9    "elements" of the charges; that is, those things the

10   government would have to prove to obtain a conviction beyond

11   a reasonable doubt?

12             THE DEFENDANT:  Yes.

13             THE COURT:  Then I can be mercifully brief.

14        Count One of the indictment charges the crime of

15   conspiracy.

16        A "conspiracy" under federal and state law is an

17   agreement between two or among three or more persons to do

18   something that the law forbids in this case to possess

19   cocaine with the intent to distribute it.

20      To prove a conspiracy, the government only has to prove

21   the agreement.  It does not have to prove that the agreement

22   succeeded in its illegal purpose, but it does have to prove

23   there was an agreement to break the law.

24        It has to prove that a given defendant was a knowing

25    and willing participant in the agreement, and that he joined

1  the conspiracy, perhaps not knowing every detail of the

2  conspiracy or even the identity of every conspirator, but

3  that he joined intending to see it succeed in achieving its

4  goal.  In this case the goal was the intent to distribute

5  cocaine.

6      A "distribution" is simply a transfer of possession

7  from one person to another.  It's usually done for

8  "consideration," like money.  But the law doesn't really pay

9  much attention to that.  A gift of a controlled substance

10 would be sufficient to meet the element of distribution if

11 the substantive crime were before us.  But, of course, the

12 crime before us is really the agreement that underlies the

13 conspiracy.

14     The second count charged -- and "count" is what we use

15 to distinguish one charged crime from another -- is a

16 conspiracy to use, carry, brandish and discharge a firearm

17 during and in relation to a drug trafficking crime.

18     This is not the best-worded statute, I think, Congress

19 ever came up with.  But a couple of terms might be a little

20 unfamiliar.  "Use" and "carry" pretty much speak for

21 themself, as does the term "discharge."

22     "Brandish" is a term that has a common meaning that's a

23 little bit different from the legal meaning.  The legal

24 meaning of "brandish" means to display all or part of a

25 firearm or, in the alternative, let it be known to someone

1    that a firearm is present and done so with the purpose of

2    intimidating that person by the fact that the firearm is

3    present.

4        "In furtherance of" again kind of speaks for itself.

5    It means assisting to achieve the crime which was the object

6    of the conspiracy, in this case drug trafficking.

7        "Drug trafficking" is not really a term of art.  It

8    just means a lot of drugs were part of the conspiracy that's

9    alleged.

10       So you're confident you understand the nature of the

11   charges?

12            THE DEFENDANT:  Yes.

13            THE COURT:  I know it's set out in the plea

14   agreement and it's somewhat beside the point because there

15   is an agreed disposition, but I think for the record,

16   Mr. Mallard, you should state the maximum statutory

17   penalties for these two crimes.

18            MR. MALLARD:  Thank you, your Honor.

19       With respect to Count One, the drug conspiracy, the

20   maximum term of imprisonment is 20 years.  The maximum fine

21   is up to $1 million.  The supervised release period is at

22   least three and up to life.  There's a $100 special

23   assessment, and forfeiture.

24       Count Two carries the same maximum penalty of 20 years;

25   supervised release for up to three years.  I misstated a

1  fine there in the plea agreement, your Honor.  It's not a

2  million dollars.  It's $250,000.  And a mandatory special

3  assessment and restitution and forfeiture.

4         THE COURT:  Is there a mandatory sentence?

5         MR. MALLARD:  There is not.

6         THE COURT:  Okay.

7         MR. MALLARD:  There was actually no mandatory

8  sentence for either count.

9         THE COURT:  All right, Ms. Stroup, because this is

10  a (C) agreement and because if I accept it I would be bound

11  by the recommended disposition, I do not think I need to go

12  through the Sentencing Guidelines because they're not going

13  to really be that much in play.  It might be more useful to

14  have Mr. Mallard, and then with any subsequent commentary

15  you have, summarize the salient aspects of the plea

16  agreement.

17         MR. MALLARD:  Certainly, your Honor.

18      We did come to an agreement with respect to the Offense

19  Level calculation.  It's, generally speaking, the ballpark

20  of 120 months that we're looking for.  I think it's a little

21  bit of a variance below.

22      This defendant, I believe, is going to end up being

23  Category II, if not Category I, with no real prior felony

24  convictions.

25      The 120 months is an agreement that we came to.  He's

1    not been in federal custody despite this case existing for a

2    little over a year.  He's been in state custody on a pending

3    matter in Boston.

4        As you can see in the sections below, the agreed

5    disposition, there is a large number of state cases which

6    were processed and largely came to a resolution, with the

7    exception of the Superior Court indictment, and I think one

8    of the Charlestown cases are still active, maybe both of

9    them are still active, that are out there and existing and

10   comprise what the government and what the defense agree are

11   relevant conduct to these two conspiracy counts that he is

12   pleading guilty to.

13       What essentially we did, your Honor, in coming to this

14   agreement is we had sort of a discrete federal count, and

15   then we had related activity in state court, which the

16   defendant had done a lot of time for, comparatively dead

17   time, for some of these cases that had already been

18   dismissed.

19       And then he had a case that -- two or three cases that

20   were active.

21       We have worked with the Suffolk DA's Office and

22   Middlesex to obtain separate agreements from them that are

23   referenced here that, upon acceptance of this (C) plea, that

24   they will be dismissing those open cases.

25       And there's also an agreement that the cases that are

1    already dismissed will not be resurrected for prosecution

2    after this plea agreement is done.

3        I think when counsel and I spoke about this and we came

4    to this understanding, this was a lot of work between us to

5    kind of figure out what was open and what was relevant, I

6    think her last numbers to me were a little over 470 days of

7    dead time on all the cases that precede the April 2022

8    arrest.

9        Am I right about that?

10       MS. STROUP:  That sounds right, although I haven't

11   done the calculations in a couple of months.

12       MR. MALLARD:  So we're, you know, hopefully going

13   to put all these firm and final numbers together in

14   anticipation of the sentencing date when the Court imposes

15   that 120 months.

16       I can tell the Court, we're not -- the government's

17   position is it's 120 months accepting that the dead time

18   will be credited towards this sentence, and if that's not

19   something that we anticipate BOP doing, we will adjust it

20   here in the recommendation before the Court at sentencing.

21       I think BOP will credit it.  We'll contact them and see

22   what their plans are.  But if they do not and they just want

23   to see him go for 120 months as of the day of sentencing and

24   we can know about that, we will amend down the (C) plea to

25   reflect that.

1          THE COURT:  That seems fair to me, given the dead

2     time.

3          MR. MALLARD:  And what I also would just say, your

4     Honor, is with the adoption of -- so he's really held on the

5     Suffolk Superior Court case.  So with the dismissal of that

6     case, we're essentially adopting it here, that's -- he's

7     been held there for at least a year cumulatively on that

8     case as well.

9          So collectively this sentence, I think, is in accord

10     with all the aspects of the sentencing factors.  We worked

11     hard to get to this agreement, knowing that this is his

12     first real -- he's done some time before, but this is his

13     first real conviction, first real sentence.  He's a young

14     man.  And as part of this, we've gotten agreements from

15     these other district attorneys.

16          And we've also entered into a waiver of appellate

17     rights, considering how much consideration is being provided

18     on the part of the government's side and also from the

19     defendant's side.  There's definitely consideration

20     mutuality here in this agreement in terms of what's being

21     given and received.

22          The defendant, I will note, in this case did not

23     contest detention, did not file any motions.  We worked

24     really proactively to get discovery to counsel

25     pre-indictment so that we could explore all these options,

1    and we are happy to present this Court with the (C) plea

2    that you have in front of you.

3            THE COURT:  Having been a state judge and state

4    prosecutor, this is quite an agreement.  This is almost as

5    complicated as negotiating the Debt Ceiling Statute because

6    I know how difficult it is to get all of these parts to

7    actually agree to come together in one place.  So I do

8    imagine that a great deal of work went into this.

9            MR. MALLARD:  Force of personality, your Honor.

10           THE COURT:  And probably lawyerly brilliance is at

11   play, too.

12       Mr. Arty, I see that you have signed the agreement

13   acknowledging that you've discussed it with Ms. Stroup.  You

14   understand its terms and its benefits?

15           THE DEFENDANT:  Yes.

16           THE COURT:  And the contemplation is that Mr. Arty

17   will be serving a federal sentence, not a state sentence?

18           MR. MALLARD:  Yes.

19           MS. STROUP:  Yes.

20           THE COURT:  Again, I don't mean any disrespect to

21   the State, but there is a benefit in that I think as well,

22   in that the federal institutions have far greater resources

23   that can be put to rehabilitation purposes than I think the

24   State at present can accomplish.

25       Mr. Arty, the only comments I will add about what has

1    been said so far -- although, Ms. Stroup, did want to add

2    anything?

3              MS. STROUP:  No, your Honor.  Thank you.

4              THE COURT:  There is a waiver of the right of

5    appeal in the agreement.

6         These waivers were very controversial when they first

7    began to appear in plea agreements now some 15 years ago.

8    Every federal circuit court has looked at these waivers and

9    have all come to the same conclusion using exactly the same

10   expected legal analysis, that is they see, that is the

11   appeals court judges, and I agree with them, that a plea

12   agreement is essentially a contract between the government

13   and the defendant.

14        What makes a contract enforceable, in a commercial

15   sense or this sense, is the exchange of consideration; that

16   is, each side is giving up something of value to the other

17   in exchange for the agreement, and that that exchange is of

18   equal weight for both sides and mutual.

19        Here the government is obviously making a number of

20   concessions to you both in terms of assistance in putting

21   the state cases together as part of the package, but also

22   agreeing to credit for the time that you otherwise might not

23   have received if this were just right off the top of the

24   case without any other considerations of the other pending

25   cases.

1          It also anticipates a federal sentence, which I think
2     is a benefit.

3          You are giving up a pretty important concession, that
4     is, that you're agreeing to plead guilty, which saves the
5     government the burden of carrying the case to a trial.

6          So in my judgment this is an enforceable agreement, and
7     I think you should understand that there will be no appeal
8     if I accept the agreement.  Understood?

9          THE DEFENDANT:  Yes, sir.

10          THE COURT:  You do understand you're giving up the
11     right to have the case tried to a jury?

12          THE DEFENDANT:  Yes.

13          THE COURT:  Have you ever seen a jury trial --

14          THE DEFENDANT:  No.

15          THE COURT:  -- other than maybe on TV?

16          THE DEFENDANT:  Yes.

17          THE COURT:  All right.  Under our law in the United
18     States -- and actually in, surprisingly, an increasing
19     number of countries, in places like Japan, Korea,
20     Argentina -- if a defendant, or for that matter the
21     government, insist on it, the decision whether a person is
22     guilty or not guilty of a crime is not made by the judge or
23     a group of judges but rather by a panel of citizens, who I
24     talked about earlier in the context of the waiver of
25     indictment, which are -- these citizens are called the

1    "jurors."

2        They are 12 in number, and they are selected from

3    citizens who are randomly designated in the eastern part of

4    Massachusetts to appear here in court on the day the case is

5    scheduled to be tried.

6        Once the potential jurors are assembled, they are

7    interviewed, principally by the judge, with regard to their

8    eligibility to serve on the case to be tried.

9        In the course of qualifying the 12 jurors, a defendant

10   and his lawyer can object to any 10 jurors that he does not

11   want seated for whatever reason, as the government can

12   object to any six jurors it does not want seated for

13   whatever reason it has in mind.

14       These are call "peremptory challenges" in the law.

15       Once 12 are qualified to sit, they are sworn to their

16   office.  They hear the evidence in the case, the arguments

17   of the lawyers.  The judge gives legal instructions, legal

18   tutoring in effect, to the jurors on the law that they're

19   going to have to apply as they find the facts in the case.

20       The jurors then meet in secret and must come to a

21   unanimous decision as to whether or not the government, in

22   fact, has proven the defendant guilty.

23       So you understand that when I say you give up the right

24   to have your case tried to a jury, I mean not only the right

25   to have a group of citizens, rather than me, make the

1    decision whether you're guilty, but also the right to

2    participate in the selection of the very jury that would

3    make that decision?

4              THE DEFENDANT:  (No response.)

5              THE COURT:  Does that make sense?

6              THE DEFENDANT:  Yes.

7              THE COURT:  You understand that I would instruct

8    the jurors that they must presume you innocent unless and

9    until the government succeeded in proving your guilt beyond

10   a reasonable doubt?

11             THE DEFENDANT:  Yes.

12             THE COURT:  Do you understand that the burden of

13   proof in an American criminal trial is proof "beyond a

14   reasonable doubt," a very heavy burden -- in fact, the

15   heaviest burden known in the law -- that the government

16   carries throughout the trial of the case?

17             THE DEFENDANT:  Yes.

18             THE COURT:  Do you understand in practical terms

19   that means you would have no obligation to prove your

20   innocence, to offer evidence, nor could you ever be

21   compelled to testify?

22             THE DEFENDANT:  Yes.

23             THE COURT:  Do you understand that by pleading

24   guilty you give up the right to have your lawyer ask

25   questions of the government's witnesses?  That's what we

1    mean by the "right of confrontation."

2                THE DEFENDANT:  Yes.

3                THE COURT:  And do you understand that you give up

4    the right to remain silent at least for today's purposes?

5                THE DEFENDANT:  Yes.

6                THE COURT:  All right.  The reason I ask that

7    question is that the prosecutor -- I'm going to ask him to

8    recite the essential facts of the case, and then I have to

9    ask if you agree to the important things that are alleged.

10   I'm not interested in details, but the important things,

11   that is, those things that go to make up the elements of the

12   crimes as we described them.

13        All right, Mr. Mallard.

14             MR. MALLARD:  Thank you, your Honor.

15        Had this case proceeded to trial, the government would

16   have proven the following facts beyond a reasonable doubt.

17        Sources of evidence would have included undercover

18   testimony, cooperating witness testimony, and consensual

19   recordings generated.  Additionally, it would have included

20   extractions from cellular phones and social media accounts.

21        In particular, this defendant was identified in

22   February of 2021 during a series of controlled purchases

23   between January and March of 2021 conducted by an undercover

24   trooper who was making controlled purchases in the area of

25   Malden.  Those controlled purchases were conducted for crack

1    cocaine and fentanyl.

2        And ultimately within the course of the investigation

3    for the third purchase, this defendant was identified as

4    arriving prior to the deal and supplying the dealer, who

5    then served the undercover trooper.

6        A fourth deal was set up.

7        That third deal was for 28 grams of crack cocaine, and

8    a fourth deal was set up for another 28 grams of crack

9    cocaine shortly thereafter.

10       During the course of that deal, rather than the dealer

11   showing up to consummate the transaction, this defendant

12   appeared.  He appeared on video with the undercover trooper,

13   identified himself by a fake name, handed over a fake

14   identification and asked for the money up front for the

15   28 grams.  The undercover trooper did not provide that

16   money, and the transaction did not go as planned.

17       Later on a search warrant was executed upon the dealer.

18   And his phone was extracted, and it determined that the

19   dealer and this defendant were discussing the distribution

20   of controlled substances for a long period; that this

21   defendant was a supplier of that dealer, and they also

22   discussed provisions of firearms.

23       Later on in this investigation, your Honor, text

24   messages were obtained relating to this defendant from a

25   variety of sources, including the phone number of a

1    cooperating witness, and also the defendant's cellular

2    devices.

3         In the course of reviewing those text messages, it was

4    revealed that he was engaged in the distribution of cocaine

5    and also marijuana, cocaine being the primary drug of

6    interest to the federal prosecution.

7         In particular, it was determine from review of those

8    text messages that the defendant traveled to California in

9    August or so of 2021, and while out there on a promotional

10   tour for an associate of the defendant's, came into contact

11   with an individual who had large quantities of cocaine.

12        The defendant took videos of that cocaine in sort of a

13   brick-package form, and then ultimately, according to the

14   text messages, stole four, what he called "tickets," or

15   kilograms, of that cocaine and FedEx'd them to himself back

16   here in Massachusetts.

17        He then communicated with others in terms of the

18   distribution of that 4 kilograms and manner and means by

19   which they could maximize their profit; for example, selling

20   it in its whole quantity as kilograms or breaking it down

21   into smaller quantities and adulterating it with cut to get

22   more price per gram.

23        Ultimately, from review of the text messages, it

24   appears that that cocaine was in fact sold.

25        The defendant was more than just simply distributing

1    drugs, your Honor.  He was also engaged in burglaries and

2    thefts to increase his drug supply.

3        In particular, on December 10, 2021, he engaged with

4    another individual in a home invasion in Lawrence, where

5    they went to Lawrence armed with firearms and attempted to

6    break into a home and strongarm, rob, a person they

7    suspected of having drugs and/or valuables in the premises.

8        While in the -- this defendant was identified in a

9    vehicle that was utilized.  He was also identified in a

10   convenience store shortly before while wearing a mask, but

11   was also identified sort of in and around the circumstances

12   the home invasion.  And during the home envision itself,

13   they made entry into the home, and this defendant

14   pistol-whipped the female occupant during the course of the

15   theft.

16       Ultimately, while they intended to steal drugs during

17   the course of that as part of the drug conspiracy, your

18   Honor -- essentially they conspired to possess the drugs by

19   stealing them -- they were unsuccessful.

20        Additionally, another burglary took place in February

21   of 2022.

22       During this incident in Everett, the defendant

23   identified a target in much the same manner he identified

24   the first target, through review of social media,

25   identification of an individual who appeared to have a large

1    amount of unexplained wealth, and who, through his efforts,

2    could identify as a potential drug trafficker and/or scam

3    artist.

4        They identified the location where this individual

5    lived, traveled there.  He and two others traveled there and

6    made entry into this individual's apartment.  The people

7    that made entry were this defendant and one of the

8    coconspirators.

9        As they made entry, there was not the goods that they

10   were looking for, but they did end up stealing a set of keys

11   to a luxury motor vehicle that was parked outside the

12   apartment complex and a large number of what they referred

13   to as "drip," that is, high-valued clothing from designer

14   stores, essentially a lot of designer, and they stole the

15   designer clothing with the intent to sell it and monetize

16   it.

17       Shortly thereafter -- and this defendant was not

18   necessary a part of it -- the individual whose property was

19   burglarized became aware of the burglary and posted a video

20   which essentially taunted the individuals who burglarized

21   him.

22       The follow morning, associates of this defendant, and

23   this defendant was not necessarily aware of this, traveled

24   to that same apartment and robbed it again.

25       This time violence ensued.  There were bullets that

1    were exchanged.

2         The defendant was not present.  I want to emphasize

3    that for the Court, but bullets were exchanged from the

4    person inside the property and the individuals who were

5    attempting to then rob the people that were there.

6         So essentially, your Honor, within about a 12-hour

7    period, this same residence was robbed twice.

8         I would also note that when the defendant was in

9    burglarizing the place, he Snapchat videoed himself inside

10   and took a video of inside the apartment that was recovered

11   by the government, which the defendant shared with a variety

12   of his coconspirators.

13        This target of the burglary and then the later

14   robbery -- there's no information about what was taken.

15   Although I can tell the Court that after the shootout --

16   that after the shooting in Everett, the defendant traveled

17   to the area to pick up his comrades or associates and they

18   made their escape.  The vehicle was impounded after it was

19   on the chase, and then ultimately there's text messages

20   between the defendant and the individuals who went into the

21   apartment on the second time discussing their alibi and

22   attempts to get the vehicle out from impound.

23        Later on, your Honor -- so that's in February of '22.

24        The individual that was targeted there was essentially

25   a rival gang member, or rapper, so to speak.

1    And later on in April, this defendant was arrested

2    outside of an after-hours nightclub in Chinatown.

3    Essentially, Boston Police responded for a call with

4    man with a gun outside of the nightclub.

5    Police responded. This defendant was operating the

6    vehicle, and the facts are a little bit hazy, but the

7    defendant did not accede to their commands to stop. He

8    drove in the direction of the officers and struck a vehicle.

9    Boston Police appear, from the reports that I have

10   reviewed, to have discharged at the vehicle, which brought

11   this defendant and his occupant to a stop. They order him

12   out at gunpoint and placed him under arrest.

13   The vehicle was searched. Two firearms were recovered

14   within. One of the firearms was a Glock with an attached

15   selector switch item that rendered it capable of being a

16   machinegun.

17   The sort of context of this and its relationship really

18   to the overall conspiracy, your Honor, is that based upon

19   review of jail calls after this incident, this defendant and

20   other coconspirators discuss the fact that the February

21   burglary victim was inside of the nightclub, and that they

22   essentially talked about how it was a potential that when he

23   came out that they would try to rob him again.

24   The conversations between the defendant and others

25   substantiate their understanding that this person was inside

1    and that they attempted -- and they were outside with the

2    intent to potentially intimidate him or rob him of jewelry

3    that he had on that night.

4        With respect to the state court matters that I

5    referenced before, your Honor, as sort of some historical

6    aspect that I think are also pertinent to this case, I will

7    start with the first in time.

8        It's going to be a July 11, 2019, incident in Revere.

9    This defendant was operating a vehicle and left the scene of

10   an accident.  After the car was stooped, the defendant got

11   out and ran from officers.  They chased him and arrested

12   him.  He was identified.  They brought him back to his

13   vehicle, and in the vehicle they observed a loaded black

14   Taurus handgun bearing Serial No. TIM35833.

15       Another incident took place, your Honor, on January 31,

16   2019, in Boston.

17       For that incident, your Honor, officers responded to an

18   apartment that they learned was being rented by a fraudulent

19   or stolen credit card.  Officers knocked on the door, and

20   four males, including this defendant who was one of them,

21   attempted to flee out the back but were stopped by police.

22       Inside of the apartment police located marijuana and

23   two loaded firearms.

24       The first firearm was located on the bed.  It was

25   loaded with ammunition.  The second firearm was out on the

1      kitchen table loaded with ammunition.

2           And those are essentially the facts, your Honor.

3           THE COURT:  That's a lot to absorb.  It sounds like

4      the script of Season IV of Breaking Bad, a lot of activity

5      going on.

6           Mr. Arty, putting aside the details, the essence is

7      that the government says that it can prove that you and

8      others were part of a conspiracy, an agreement, to

9      distribute large quantities of cocaine; that in at least one

10     instance, I think December 10, 2021, was the specific date

11     the prosecutor referred to, you did use a firearm in

12     furtherance of the drug conspiracy itself.  That's where the

13     "brandishing, use and carry," element comes from.

14          Do you accept responsibility for the basic facts as the

15     government alleges; that is, those facts that go to make up

16     the components or elements of the two crimes?

17          THE DEFENDANT:  Yes, your Honor.

18          THE COURT:  Are you offering to plead guilty

19     willingly, freely, and voluntarily?

20          THE DEFENDANT:  Yes.

21          THE COURT:  Has anyone made any secret promises to

22     you -- we have a lot of promises that are not secret because

23     they're in the agreement -- to induce you to plead guilty?

24     Is there anything that I don't know about that has been

25     promised for your plea?

```
1                    THE DEFENDANT:  No.

2                    THE COURT:  Has anyone attempted to coerce you in a

3       physical sense into pleading guilty?

4                    THE DEFENDANT:  No.

5                    THE COURT:  Have any threats been made, other than,

6       of course, the threat of being prosecuted?

7                    THE DEFENDANT:  No.

8                    THE COURT:  Have you had sufficient time to discuss

9       with Ms. Stroup your rights, your possible defenses, and the

10      consequences of waiving indictment and pleading guilty?

11                   THE DEFENDANT:  Yes.

12                   THE COURT:  Do you believe that she has acted at

13      all times in your best interest?

14                   THE DEFENDANT:  Yes.

15                   THE COURT:  Have I confused you by anything I've

16      asked or said?

17                   THE DEFENDANT:  I didn't hear you.

18                   THE COURT:  I'm sorry.

19           Did I confuse you with anything I asked or said?

20                   THE DEFENDANT:  No.

21                   THE COURT:  Am I correct that you're offering to

22      plead guilty because you are guilty, and the government

23      clearly has amassed a pretty significant amount of evidence

24      in the case, and you think it's in your best interest to

25      resolve all of these case as you're proposing to do?
```

1          THE DEFENDANT:  Yes.

2          THE COURT:  Ms. Stroup, anything I should have

3     inquired into that I overlooked?

4          MS. STROUP:  No.  Thank you, your Honor.

5          THE COURT:  Mr. Mallard, anything you were

6     expecting to hear that you didn't?

7          MR. MALLARD:  No, your Honor.

8       I just would ask, is it the Court's preference to

9     continue acceptance of the plea agreement until sentencing?

10         THE COURT:  Well, I think that's actually the law

11    as I understand it now.

12       All right.  I find that the defendant is well-oriented.

13    He has a significant high school education and a GED.  He's

14    clearly an intelligent mean.

15       I believe that he has offered to plead guilty with a

16    full understanding of the nature and consequences of doing

17    so.

18       I believe that there is sufficient evidence submitted

19    by the government, as acknowledged by the defendant, to

20    warrant a finding of guilt beyond a reasonable doubt on

21    these two offenses.

22         In sum, because I find that the tender of the plea is a

23    voluntary tender, made with full knowledge of the

24    consequences of doing so, I'm prepared to accept the plea

25    and will instruct the clerk to so enter the plea on the

1    record now.

2             THE CLERK:  Please stand, sir.

3        Mr. Arty, Count One of the Superseding Information

4    charges with you conspiracy to distribute and possess with

5    intent to distribute controlled substances, in violation of

6    Title 21, United States Code, Section 846.

7        How do you plead to Count One, "guilty" or "not

8    guilty"?

9             THE DEFENDANT:  Guilty.

10             THE CLERK:  Count Two charges you with conspiracy

11    to possess firearms in furtherance of a drug trafficking

12    crime, in violation of Title 18, United States Code, Section

13    924.

14        How do you plead to Count Two, "guilty" or "not

15    guilty"?

16             THE DEFENDANT:  Guilty.

17             THE CLERK:  Thank you.  You may be seated.

18             THE COURT:  All right.  As I indicated, I accept

19    the plea, and, as I also indicated, I will defer acceptance

20    of the plea agreement, understanding that there's a great

21    deal of work still to be done in preparation for sentencing,

22    which, Tim...

23             THE CLERK:  August 30, 3 p.m.

24             THE COURT:  All right.

25        So, Mr. Arty, I will see you then in August for the

1    sentencing hearing.

2        We'll otherwise be in recess on this matter until that

3    date.

4            THE CLERK:  All rise.

5            MR. MALLARD:  Thank you, your Honor.

6            MS. STROUP:  Your Honor, I may be unavailable --

7            THE CLERK:  I will talk to you.

8            MS. STROUP:  Thank you.

9        (Proceedings adjourned.)

# **C E R T I F I C A T E**

I, James P. Gibbons, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

<u>/s/James P. Gibbons</u>            June 6, 2023
        James P. Gibbons


                JAMES P. GIBBONS, CSR, RPR, RMR
                    Official Court Reporter
                 1 Courthouse Way, Suite 7205
                  Boston, Massachusetts 02210
                  jamesgibbonsrpr@gmail.com